UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-cv-80111 (JIC)

| | |
|---|---|
| JASON JOVINE, individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>ABBOTT LABORATORIES, INC. d/b/a ABBOTT SALES, MARKETING and DISTRIBUTION CO., a Delaware corporation, and ABBOTT LABORATORIES d/b/a ABBOTT NUTRITION, an Illinois corporation,<br><br>*Defendants*. | |

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiff Jason Jovine ("Plaintiff" or "Jovine") brings this Second Amended Class Action Complaint (the "Complaint") against Defendants Abbott Laboratories, Inc., a Delaware corporation d/b/a Abbott Sales, Marketing and Distribution Co. and Abbott Laboratories d/b/a Abbott Nutrition, an Illinois corporation (collectively referred to as "Abbott" or "Defendants"), on his own behalf and on behalf of a class of similarly situated individuals who purchased Abbott's Similac-brand of powdered infant formulas. Plaintiff, for his Complaint, alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

### Introduction

1. This case involves Defendants' formulation, design, manufacturing, marketing, advertising, distribution, and selling of various defective Similac-brand powdered infant formulas. On September 16, 2010, Defendants discovered that certain Similac-brand formulas

1

had been contaminated and contained beetles and beetle larvae which, if consumed by infant children, could lead to serious health concerns, including gastrointestinal distress, diarrhea and vomiting.

2. Despite a long history of recalls of their infant formulas and knowledge that Similac is widely used by individual consumers and medical institutions throughout the United States, Defendants waited—at a minimum—nearly an entire week before informing the public of the contamination and attendant health risks.

3. Through their conduct alleged herein, Defendants caused serious injury to Plaintiff and the putative Classes he seeks to represent. Plaintiff now brings this Complaint to obtain relief for those injuries and to ensure that Defendants' conduct does not threaten the health of his child or other infant children in the future.

**Parties**

4. Plaintiff Jason Jovine is a natural person and citizen of the State of Florida.

5. Defendant Abbott Laboratories, Inc. is a corporation organized and existing under the laws of the State of Delaware. Abbott Laboratories maintains its United States headquarters and principal place of business at 100 Abbott Park Road, Abbott Park, Illinois 60064-3500.

6. Defendant Abbott Laboratories d/b/a Abbott Nutrition is a corporation organized and existing under the laws of the State of Illinois. Abbott Nutrition maintains its United States headquarters and principal place of business at 100 Abbott Park Road, Abbott Park, Illinois 60064-3500.

**Jurisdiction and Venue**

7. By Order dated April 7, 2011, this Court has jurisdiction over the causes of action asserted herein pursuant to 28 U.S.C. § 1332(d), because (a) at least one member of the putative

Classes is a citizen of a state different from Defendants, (b) the amount in controversy exceeds $5,000,000 exclusive of interest and costs, and (c) none of the exceptions under that subsection apply to this action.

8. This Court has jurisdiction over Defendants because they conduct substantial business in the State of Florida and this District and many of Defendants' wrongful acts directly affect Florida citizens including Plaintiff Jovine.

9. This Court is an appropriate venue for the adjudication of this controversy because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## General Allegations Common to All Counts

10. Abbott is one of the world's largest health care and pharmaceutical companies. Abbott is in the business of formulating, designing, manufacturing, marketing, advertising, distributing, and selling, *inter alia*, various infant powder formulas including those packaged in rectangular plastic tubs. One of the infant powder formula product lines formulated, designed, manufactured, marketed, advertised, distributed and sold by Abbott is the infant formula known as Similac.

11. Similac is one of the nation's best-selling powdered formulas for infants, and is the most widely-used infant formula in hospitals across the United States. Similac branded products are sold in grocery stores and pharmacies throughout the United States, including in Florida.

12. Defendants market Similac products to parents as a product that "Moms can count on for trusted nutrition and the formula that's right for their babies."[1]

---

[1] *Available at* http://e-mediaroom.com/similac_data/downloads/media/14_Similac%20Brand%20Fact%20Sheet%20FINAL%2005-04-10.pdf?sl=similac_data.

13. Similac products are often recommended for consumption by premature or developmentally disabled infant children. Indeed, the packaging of Similac products promotes their use to build "immune support," "strong bones" and healthy "brain and eyes." In addition, Defendants' marketing materials claim that "[e]ach of the formulas in our line provides the balance of protein, minerals, and other nutrients that helps give babies a strong start in life. A baby's first year is so important, so count on Similac for nutrition you can trust."

14. Similac's packaging also represents that it is safe for consumption by infants of certain ages, for example "Birth to 12 months."

### The Recall

15. On or about September 22, 2010, Abbott announced that consumers should immediately stop using Similac powder products because they were believed to contain pieces of beetles or beetle larvae.

16. According to Abbott's announcement:

> Abbott is recalling these products following an internal quality review, which detected the remote possibility of the presence of a small common beetle in the product produced in one production area in a single manufacturing facility. The United States Food and Drug Administration (FDA) has determined that while the formula containing these beetles poses no immediate health risk, there is a possibility that infants who consume formula containing the beetles or their larvae could experience symptoms of gastrointestinal discomfort and refusal to eat as a result of small insect parts irritating the GI tract. If these symptoms persist for more than a few days, a physician should be consulted.

17. According to its own accounts, Abbott first became aware of the contamination of its products on September 16, 2010. Indeed, a letter written to Abbott by the Senate Health, Education, Labor and Pensions Committee Chairman, Senator Tom Harkin, indicated that "Abbott detected the insect contamination on September 16, 2010."

18. Nevertheless, despite detecting the contaminated infant formula Abbott delayed—at a minimum—almost an entire week before it recalled the defective products on or about September 22, 2010.

19. Abbott's eventual recall encompasses all Similac powdered formula sold in rectangular tubs, including:

> Certain Similac powder product lines offered in plastic containers.
> Certain Similac powder product lines offered in sizes such as 8-ounce, 12.4 ounce and 12.9-ounce cans.

The complete list of Defendants' recalled products at issue spans more than 37 typed-pages.

20. On information and belief, the recall encompasses more than 2000 lot numbers, and in excess of five million tubs.

**Defendants' Past Problems with Infant Formula**

21. Abbott is no stranger to recalls of its infant formulas.

22. In February 2005, Abbott issued a recall of its Similac Advance baby formula after plastic particles were discovered in products that had been distributed months earlier, between September and October 2004.

23. Later, in September 2006, Abbott recalled hundreds of thousands of containers of Similac liquid formula. The recall was related to defects in the formula's packaging that led to decreased levels of vitamin C, which resulted in various medical problems for infants who consumed the products, including vitamin C deficiencies, irritability and general tenderness.

24. In May 2007, Abbott recalled its Similac Special Care Ready-to-Feed Premature Infant Formula with Iron, as a result of lower than advertised iron levels contained in the products. Consumption of the recalled products put premature infants at an increased risk of

5

developing anemia. The recall came months after the products were first distributed in November 2006.

25. In May 2008, Abbott recalled multiple lots of its Calcilo XD infant formula as a result of the products' unintended oxidation. Consumption of the highly oxidized products could lead to gastrointestinal problems in infants, including nausea, vomiting, and diarrhea. The products were not recalled until nearly two years after distribution began in the United States and internationally.

**Abbott's Wrongful Conduct at Issue Here**

26. In this case, Abbott negligently formulated, designed, manufactured, marketed, advertised, promoted, distributed and sold Similac products that caused serious health problems in infant children including, but not limited to, diarrhea, gastrointestinal discomfort and vomiting.

27. Abbott failed to properly exert quality control measures to ensure that the infant formulas were safe for consumption, did not cause adverse health effects, and did not contain beetle parts and beetle larvae.

28. Upon detecting that its Similac products contained beetle parts and beetle larvae on or about September 16, 2010, Abbott waited approximately one week before disclosing to the public the fact that its Similac products were unsafe for consumption, and issuing the recall of those products.

29. Plaintiff relied upon the misrepresentations made by Defendants about the quality and health benefits of their Similac products in marketing materials and advertising campaigns. Plaintiff reasonably believed in the quality and safety of Similac products, and that Similac products would not adversely affect his infant child's health. Defendants misled Plaintiff into

6

purchasing the unsafe Similac products, which did not provide the attributes and benefits Plaintiff reasonably sought and expected to receive.

30. As a result of Defendants' acts and practices detailed herein, Plaintiff purchased Similac products that were not safe for consumption by his infant child. Prior to their sale, these defective products were in Abbott's exclusive possession and therefore, Abbott was obligated to disclose the defective nature of the products.

31. Abbott failed to warn purchasers of the unreasonably dangerous characteristics associated with its Similac products, including the fact that they may cause serious gastrointestinal discomfort, diarrhea, vomiting and other health problems.

32. Abbott owed a legal duty to Plaintiff to formulate, design, manufacture, market, advertise, distribute and sell Similac products that were safe for human consumption, and to refrain from selling them if they did not meet such standards.

33. As described herein, Abbott breached this duty, which directly and proximately caused or resulted in Plaintiff's injury in fact, a loss of money or property, the personal expenditure of time and resources and/or other forms of injury, damage, mental anguish, and/or physical pain and suffering.

34. As a reasonable consequence of Defendants' breach of their duties described above, including suffering from gastrointestinal and other health related problems due to the consumption of Similac, Plaintiff and the putative Classes are entitled to the reasonable value of medical monitoring for their infant children. The reasonableness of medical monitoring is bolstered by (1) the significance and extent of the consumption of Defendants' Similac products, (2) the age of the individuals consuming Similac products, (3) the seriousness of the conditions for which the Classes' infant children are at risk, and (4) the clinical value of early detection.

35. Abbott, in the exercise of reasonable care, should have known that the failure to exercise proper safety standards and equipment management would have led to insects infiltrating Similac products, thereby creating formulas unsafe for infant consumption. Abbott did expect or reasonably should have expected Plaintiff and the members of the putative Classes to purchase and ingest Similac products, and that the products' defective condition would adversely affect their infant children.

36. Plaintiff and the members of the putative Classes would not have purchased the recalled Similac products had they known of their defective condition, including being contaminated with insect pieces and larvae.

### Facts Specific to Plaintiff Jovine

37. Plaintiff is the father of an infant child.

38. Shortly after his child's birth on July 29, 2010 and throughout August and September 2010, Plaintiff viewed and read Defendants' promotional, advertising and marketing materials for their Similac-brand of powdered infant formula products. Those materials—contained in magazines and other publications including *American Baby*—represented that Abbott had been providing "high-quality nutrition to babies for more than 85-years."

39. Similarly, prior to purchasing the Similac formula at issue here, Plaintiff viewed the formula's packaging materials, which represented that the formula was safe for consumption by children ages "Birth to 12 Months."

40. From Abbott's representations in its marketing and packaging materials, Plaintiff reasonably understood that Abbott's products, including the Similac products at issue here, were safe for consumption by his infant child. Therefore, in reliance upon those representations,

Plaintiff purchased Similac infant formula from his local Publix grocery store on numerous occasions throughout August and September 2010 and fed it to his infant child.

41.     Until Plaintiff learned of the recall issued on September 22, 2010, his child consumed the recalled Similac infant formula exclusively.

42.     During the time that Plaintiff's child consumed the recalled Similac products at issue here, he suffered from severe gastrointestinal discomfort, skin irritations, cried constantly and was unable to sleep.

43.     Upon learning of Defendants' September 22, 2010 recall, Plaintiff immediately stopped feeding his child the recalled Similac formula and his child's symptoms described above quickly subsided.

## Class Representation Allegations

44.     Plaintiff brings this Complaint pursuant to Fed. R. Civ. P. 23(b)(3) on behalf of a Class and SubClass (collectively the "Classes"), defined as follows:

> **The Class:** All persons in the United States who purchased Similac infant formula that is subject to Abbott's Similac recall of September 22, 2010. Excluded from the Class are 1) any Judge or Magistrate presiding over this action and members of their families; 2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers and directors; 3) persons who properly execute and file a timely request for exclusion from the class; and 4) the legal representatives, successors or assigns of any such excluded persons.
>
> **The SubClass:** All Florida citizens who purchased Similac infant formula that is subject to Abbott's Similac recall of September 22, 2010. Excluded from the Class are 1) any Judge or Magistrate presiding over this action and members of their families; 2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers and directors; 3) persons who properly execute and file a timely request for exclusion from the class; and 4) the legal representatives, successors or assigns of any such excluded persons.

45.     Plaintiff reserves the right to amend these definitions based upon information

learned in discovery.

46. **Numerosity:** The exact number of the members of the Classes is unknown and is not available to Plaintiff, but individual joinder is impracticable. The Defendants have over one million customers who purchased their recalled Similac products. Members of the Classes can likely be identified through Defendants' records.

47. **Commonality:** Common questions of fact and law exist as to all members of the Classes and predominate over questions affecting only individual members. With respect to the Class and SubClass, these common questions include:

(a) Whether Defendants were negligent in their formulation, design, manufacture, distribution, marketing, and sale of Similac products as alleged herein;

(b) Whether Defendants' wrongful conduct as alleged herein constitutes intentional misrepresentation;

(c) Whether Defendants' wrongful conduct as alleged herein constitutes negligent misrepresentation; and

(d) Whether Plaintiff and the putative Classes are entitled to relief, and the nature of such relief.

48. **Typicality:** Plaintiff's claims are typical of the claims of the other members of the Classes, as Plaintiff and the other members of the Classes sustained damages arising out of Defendants' wrongful conduct, based upon the same transactions made uniformly with respect to Plaintiff and the public. The Florida laws under which Plaintiff's claims arise do not conflict with the laws of any other state in any material way.

49. **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the other members of the Classes, and has retained counsel competent and

experienced in complex class actions. Neither Plaintiff nor his counsel has any interest antagonistic to those of the Classes, and Defendants have no defenses unique to Plaintiff.

50.  **Predominance and Superiority:** This class action is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members of the Classes is impracticable. The damages suffered by the individual members of the Classes will likely be relatively small, especially when compared to the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. Accordingly, it would be virtually impossible for the individual members of the Classes to obtain effective relief from Defendants' misconduct. Even if members of the Classes themselves could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

51.  **Policies Generally Applicable to the Class:** This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the Classes as a whole. Defendants' practices and policies challenged herein apply to and affect all members of the Classes uniformly, and Plaintiff's challenge of these practices and policies hinges on Defendants' conduct, not on facts or law applicable only to Plaintiff.

### COUNT I
### Negligence
### (On behalf of the Classes)

52.   Abbott, as a manufacturer, distributor and seller of food products, including those intended for consumption by infants, owes a duty to its customers to use reasonable care in the formulation, manufacture, marketing, advertising, distribution, and sale of its products to ensure that they are not adulterated, contaminated, injurious to health, or otherwise unfit for human, and particularly, infant consumption.

53.   Defendants breached their duty as described herein by failing to exercise reasonable care in the formulation, manufacture, marketing, advertising, distribution, and sale of their Similac products, which according to Defendants' own statements, contained insect parts and larvae.

54.   As a direct and proximate result of Defendants' failure to exercise reasonable care in the formulation, manufacture, marketing, advertising, distribution, and sale of their Similac products, Plaintiff and the members of the putative Classes suffered damages.

55.   In Plaintiff's case, his infant child consumed the recalled Similac formulas exclusively from his birth on July 29, 2010 until Defendants' September 22, 2010 recall.

56.   During that time, Plaintiff's child suffered from severe gastrointestinal discomfort, skin irritations, cried constantly and was unable to sleep.

57.   Upon learning of Defendants' September 22, 2010 recall, Plaintiff immediately stopped feeding his child the recalled Similac products and his child's symptoms described above quickly subsided.

58.   Accordingly, Plaintiff, on behalf of himself and the putative Classes, seeks an award of all damages incurred as a result of Defendants' negligent conduct described herein.

## COUNT II
### Intentional Misrepresentation
### (On behalf of the Classes)

59. Through their marketing and packaging materials, Defendants represented to Plaintiff and the members of the putative Classes that Similac products promote the health and well being of infants and are safe for ingestion by infant children.

60. Shortly after his child's birth on July 29, 2010, and throughout August and September 2010, Plaintiff viewed and read Defendants' promotional, advertising and marketing materials for its Similac-brand of products. Those materials—contained in magazines and other publications including *American Baby*—represented that Abbott had been providing "high-quality nutrition to babies for more than 85-years."

61. Similarly, prior to purchasing the Similac formula at issue here, Plaintiff viewed the formula's packaging materials, which represented that the formula was safe for consumption by children ages "Birth to 12 Months."

62. From Defendants' representations, Plaintiff reasonably understood that the Similac infant formula products at issue here were safe for consumption by his infant child.

63. In reality, Defendants' representations were false, and at the time they were made Defendants knew of their falsity. Contrary to Defendants' representations, the Similac products at issue in this Complaint contained pieces of beetles and beetle larvae, which can cause serious health problems in infant children who consume them, including, but not limited to, diarrhea, vomiting and gastrointestinal discomfort.

64. Defendants intended that Plaintiff and the members of the putative Classes rely on their false statements by purchasing Similac products for consumption by their infant children.

65. In reliance upon Defendants' representations made in their marketing and packaging materials, Plaintiff and the members of the putative Classes purchased the recalled Similac products and fed them to their infant children.

66. As a direct and proximate result of Defendants' misrepresentations, Plaintiff and the members of the putative Classes suffered damages.

67. Accordingly, Plaintiff, on behalf of himself and the putative Classes, seeks an award of all damages incurred as a result of Defendants' unlawful conduct described herein.

### COUNT III
### Negligent Misrepresentation
### (On behalf of the Classes)

68. Through their marketing and packaging materials, Defendants represented to Plaintiff and the members of the putative Classes that Similac products promote the health and well being of infants and are safe for ingestion by infant children.

69. Shortly after his child's birth on July 29, 2010, and throughout August and September 2010, Plaintiff viewed and read Defendants' promotional, advertising and marketing materials for its Similac-brand of products. Those materials—contained in magazines and other publications including *American Baby*—represented that Abbott had been providing "high-quality nutrition to babies for more than 85-years."

70. Similarly, prior to purchasing the Similac formula at issue here, Plaintiff viewed the formula's packaging materials, which represented that the formula was safe for consumption by children ages "Birth to 12 Months."

71. From Defendants' representations, Plaintiff reasonably understood that the Similac infant formula products at issue here were safe for consumption by his infant child.

72. In reality, Defendants' statements were false, and at the time such false statements were made, Defendants knew or should have known of their falsity or, at the very least, acted with negligence and carelessness in ascertaining the truth of their false statements. Contrary to Defendants' representations, the Similac products at issue in this Complaint contained pieces of beetles and beetle larvae, which can cause serious health problems in infant children who consume them, including, but not limited to, diarrhea, vomiting and gastrointestinal discomfort.

73. Defendants intended that Plaintiff and the members of the putative Classes rely on their false statements by purchasing Similac products for consumption by their infant children.

74. In reliance upon Defendants' representations made in their marketing and packaging materials, Plaintiff and the members of the putative Classes purchased the recalled Similac products and fed them to their infant children.

75. As a direct and proximate result of Defendants' misrepresentations, Plaintiff and the members of the putative Classes have suffered damages.

76. Accordingly, Plaintiff, on behalf of himself and the putative Classes, seeks an award of all damages incurred as a result of Defendants' unlawful conduct described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jason Jovine, on behalf of himself and the putative Classes, respectfully requests the following relief:

A. Certify this case as a class action on behalf of the Class and SubClass defined above, appoint Plaintiff Jason Jovine Class Representative, and appoint the undersigned Class Counsel;

B. Declare that Defendants' actions, as set out above, constitute negligence, intentional misrepresentation and/or negligent misrepresentation;

  C. Enter judgment against Defendants for all damages caused by their conduct;

  D. Award Plaintiff and the Classes pre- and post-judgment interest, to the extent allowable;

  E. Enter injunctive or other relief as necessary to protect the interests of Plaintiff and the Classes;

  F. Award Plaintiff and the Classes their reasonable litigation expenses and attorneys' fees, to the extent allowable; and

  G. Award such other and further relief as the Court deems equitable and just.

## JURY DEMAND

Plaintiff requests a trial by jury of all issues that can be so tried.

Respectfully submitted,

Dated: April 26, 2011

**JASON JOVINE**, individually and on behalf of all others similarly situated,

By: _____
One of Plaintiff's Attorneys

David P. Healy (940410)
2846-B Remington Green Cir.
Tallahassee, FL 32308
(850) 222-5400
(850) 222-7339 (fax)
*dhealy@davidhealylaw.com*

16